**In re WINGO.**

[Cite as *In re Wingo* (2001), 143 Ohio App.3d 652.]

Court of Appeals of Ohio,
Fourth District, Ross County.

No. 00CA2581.

Decided June 1, 2001.

654

656

*Catanzaro & Rosenberger* and *Michele R. Rout,* for appellant Timothy Wingo.

*Scott W. Nusbaum,* Ross County Prosecuting Attorney, and *Steven E. Drotleff,* Assistant Prosecuting Attorney, for appellee state of Ohio.

HARSHA, Judge.

Timothy Wingo appeals the termination of his parental rights and the grant of permanent custody of his child to Ross County Children's Services ("RCCS") by the Juvenile Division of the Ross County Court of Common Pleas. He assigns the following errors:

"I. The trial court erred in ordering permanent custody to Children's Services Board as such was against the manifest weight of the evidence.

"II. Appellant was denied due process of law and equal protection as guaranteed under the United States Constitution and the Ohio Constitution.

"III. Appellant was denied his right to effective assistance of counsel at both the trial level and the permanent custody proceedings."

Finding no merit in any of these assigned errors, we affirm the trial court's judgment.

I

Timmy Wingo (D.O.B. 6/5/98) was removed from the custody of his mother, Tina Wright, on June 9, 1998, because his half-sister, Brandy (D.O.B. 7/5/95), had already been found a dependent child. Temporary custody was awarded to RCCS, and Timmy was placed in the custody of Chris and Dayna Johnson, Wright's cousin and his wife. After a few weeks, the Johnsons indicated that they were no longer able to care for Timmy, and he was placed in foster care. Timmy was later determined to be a dependent child.

In May 1999, the court returned Brandy to Wright's custody; however, it extended temporary custody of Timmy, and RCCS was attempting to reunite him with his mother. This reunification was not accomplished, and in August 1999 the court again removed Brandy from Wright's custody. In September 1999, RCCS filed a motion for permanent custody of Timmy. The hearing on the motion was originally scheduled in January 2000 but was rescheduled when Mr. Wingo appeared without counsel. The magistrate appointed counsel for Wingo, and the hearing was conducted in April and August 2000.

The magistrate issued her findings, and, in November 2000, the court granted RCCS's motion to terminate the parental rights of Wingo and Wright and placed Timmy in the permanent custody of RCCS. In December 2000, Wingo filed a motion for leave to file objections to the magistrate's findings out of rule and objections to the magistrate's findings. The court found good cause to allow the objections to be filed out of rule but overruled them on the merits, approved the magistrate's decision, and affirmed its prior judgment. A timely appeal was filed.

## II

In his first assignment of error, Wingo argues that the court's grant of permanent custody of Timmy to RCCS is against the manifest weight of the evidence. We disagree.

A parent's right to raise his or her child is an "essential" and "basic civil right." *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169, citing *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–1213, 31 L.Ed.2d 551, 558–559. Moreover, parents have a "fundamental liberty interest" in the care, custody, and management of the child. *In re Murray,* citing *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–1395, 71 L.Ed.2d 599, 606. However, the rights and interests of a natural parent are not absolute.

R.C. 2151.413, which permits a public children services agency to file a motion requesting permanent custody of a child, states:

"(A) A public children services agency * * * that * * * is granted temporary custody of a child who is not abandoned or orphaned may file a motion in the court that made the disposition of the child requesting permanent custody of the child."

R.C. 2151.414(B) provides that a court may grant a motion for permanent custody if the court determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child, and (2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents. The "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C. 2151.414(C) prohibits the court from considering the effect that the granting of permanent custody to a children services agency would have upon the parents. In *In re William S.* (1996), 75 Ohio St.3d 95, 97, 661 N.E.2d 738, 740, the court wrote:

"Initially, we note that in interpreting the statutory provisions pertaining to juvenile court, we must carry out the purposes of the statute as stated in R.C. 2151.01:

" 'The sections in Chapter 2151. of the Revised Code * * * shall be liberally interpreted and construed so as to effectuate the following purposes:

" '(A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code;

" '(B) * * *

" '(C) To achieve the foregoing purposes, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety * * *.' "

When making the "best interest" determination, courts must consider all relevant factors. R.C. 2151.414(D) provides that relevant factors include the child's probability of adoption and whether adoptive placement would benefit the child, the child's interaction with family members and others, the child's custodial history, and the child's need for a legally secure permanent placement. When making the determination of whether the child cannot be placed with either of his parents within a reasonable period of time, a court must likewise consider all relevant evidence. If the parents have failed "continuously and repeatedly" to substantially remedy the conditions that led to the temporary custody order, R.C. 2151.414(E)(1) requires the court to find that "the child cannot be placed with either parent within a reasonable time." That subsection requires that courts consider the parents' utilization of social and rehabilitative services that were made available to them. If the parents have demonstrated a lack of commitment toward the child, R.C. 2151.414(E)(4) also requires that the court find that "the child cannot be placed with either parent within a reasonable time."

In *In re Butcher* (Apr. 10, 1991), Athens App. No. 1170, unreported, 1991 WL 62145, we noted that R.C. 2151.414 does not require that each and every condition listed in subsection (E) exist before the court may terminate parental rights. The trial court may make its decision based solely on the existence of one of the conditions. When R.C. 2151.414(E)(1) forms the basis for the court's finding, the agency must have provided a case plan and time to remedy the situation that led to the removal of the children from the household. However, the other factors listed in R.C. 2151.414(E) do not require application of a case plan nor time to remedy the situation. See *In re Mark H.* (Apr. 30, 1999), Lucas App. No. L–98–1238, unreported, 1999 WL 253163.

When permanent custody is sought by motion, R.C. 2151.419 is also applicable. R.C. 2151.419(A)(1) requires that the court determine whether the children's services agency that will be given custody of the child has made reasonable efforts to make it possible for the child to return home safely. The agency has the burden of proving that it made reasonable efforts. However, the child's

safety and health are paramount in determining whether reasonable efforts were made.

In a permanent custody proceeding, trial courts must use the "clear and convincing evidence" standard of proof. See R.C. 2151.414. Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof. In *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60, the court wrote that the standard of "clear and convincing evidence" is defined as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' "

An appellate court should not substitute its judgment for that of the trial court when competent and credible evidence going to all the essential elements of the case exists. *Id.; In re Kincaid* (Oct. 27, 2000), Lawrence App. No. 00CA3, unreported, 2000 WL 1683456. This standard of review is used by appellate courts in reviewing awards of permanent custody of children to children's services agencies. See *Jones v. Lucas Cty. Children Serv. Bd.* (1988), 46 Ohio App.3d 85, 86, 546 N.E.2d 471, 472–473; *In re Lay* (1987), 43 Ohio App.3d 78, 80, 539 N.E.2d 664, 667–668; *In re Wright* (Oct. 4, 1990), Washington App. No. 90CA10, unreported, 1990 WL 155747. In *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276, the court reviewed the principle that reviewing courts may not reweigh the evidence, but must affirm judgments supported by competent, credible evidence:

"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." See, also, *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, and *In re Butcher, supra.*

The trial court found that RCCS made reasonable efforts to prevent Timmy's removal from the home, that Timmy was not abandoned, and that he cannot be placed with either parent within a reasonable period of time. The court further found that Timmy needs a legally secure home and that this cannot be accomplished without a grant of permanent custody. Moreover, Timmy is a good candidate for adoption. The court went on to find that Wingo and Wright have failed continually and repeatedly to substantially remedy the conditions that required removal. Wingo and Wright also demonstrated a lack of commitment

toward Timmy by failing to regularly support, visit, provide an adequate permanent home, and meet Timmy's basic needs. Therefore, the court found that it was in Timmy's best interest to grant permanent custody to RCCS.

■ As pertains to Wingo, the court found that he had only one visit with Timmy prior to the filing of the permanent custody motion and had not established a relationship with Timmy. Wingo did not complete parenting classes, and his personal and home life is unstable. He has not displayed an ability to meet Timmy's basic needs or provided any support or maintained his own home.

Todd Helmick, the RCCS caseworker assigned to Timmy's case, testified that in the most recent case plan, the concerns that he identified were that Timmy's basic needs were not being met, that Wright and Wingo needed to learn and demonstrate proper parenting skills, and that Wingo needed to take a more active role in Timmy's life. He was also concerned that the parents had been involved in illegal activities, utilized drugs and/or alcohol to deal with their problems, and did not exercise visitation. These concerns were similar to those expressed by RCCS throughout the life of the case.

■ Helmick testified that Wright seemed to be working towards reunification with Timmy as of May 1999.[1] She completed parenting classes as required, though she missed several classes. She was visiting with Timmy and had been reunited with Brandy, who was living with her. RCCS was planning on reuniting Wright and Timmy in June or July 1999. However, shortly after Brandy began residing with her, Wright began "slipping." Wright canceled or failed to appear for numerous visits with Timmy, and when she did visit with Timmy, she always ended the visits early for various reasons. Wright stated that she couldn't handle Timmy and that he "got on her nerves." She missed ten out of fifteen visits between June 1, 1999 and September 7, 1999. From September 14, 1999 to December 29, 1999, Wright attended four visits out of the sixteen that were scheduled. From January 5, 2000 to April 4, 2000, RCCS scheduled fourteen visits, and Wright did not attend any. Helmick and Carol Wormith, Timmy's foster mother, outlined a series of problems that had occurred during visitations, including Wright's failing to have diapers, transporting Timmy in a vehicle without a car seat, and simply not being home when Timmy was brought to her apartment for visitation.

---

1. Tina Wright, Timmy's mother, did not file an appeal. Because R.C. 2151.414(B) requires a finding that the child cannot or should not be placed with either parent, we address the evidence and findings of the court regarding Wright. However, Wingo does not expressly assert that Timmy should have been placed with Wright. Therefore, we do not consider whether Wingo has standing to make such an assertion.

RCCS also received numerous reports of parties and other activities at Wright's apartment. Though RCCS obtained housing for Wright through the Municipal Housing Authority, she was evicted from her apartment in January 2000 because of continuous complaints from neighbors, local police, and the Housing Authority security guard. Wright was also arrested for driving without a license and contributing to the delinquency of a minor. She tested positive for marijuana use in June 1999. Wright also failed to maintain contact with her caseworker, and RCCS was frequently unable to contact her. Helmick testified that although RCCS provided Wright with numerous resources and referrals, she continued to stray from her case plan and would "party" instead of providing for and caring for her children.

Jannie Thomas, the protective services supervisor at RCCS, testified that Wingo was originally in the military and that RCCS attempted to contact him via certified mail. When he returned to Ross County, Wingo never contacted RCCS. Visits with Timmy were scheduled, and Wingo was advised of the visits but did not attend. Thomas further testified that RCCS made numerous attempts to maintain contact with Wingo. Although Wingo was referred for parenting classes, he never attended them.

Thomas testified that she had a conversation with Wingo in August 1999. She instructed Wingo to contact RCCS, maintain contact, and participate in visitation so he could develop a relationship with Timmy. Wingo's contact with RCCS between August 1999 and April 2000 was sporadic at best, and Thomas had no personal contact with him during that period.

Helmick testified that prior to the filing of the motion for permanent custody, Wingo had attended only one visitation with his son, on December 18, 1998. On that occasion, Helmick explained the case goals to Wingo and told Wingo what he needed to accomplish in order to obtain custody of Timmy, including providing for Timmy's basic needs and taking a positive role as Timmy's father. He also needed to learn and demonstrate proper parenting skills. Wingo never attended parenting classes. Scheduled visitations continued until March 15, 1999 when the visitations were terminated because Wingo failed to attend. Wingo provided excuses such as being sick, forgetting, or being in jail or in trouble with the law. Helmick testified that he saw Wingo's name in the newspaper several times for being "in trouble with the law" and that he was often unable to contact Wingo for this reason.

Helmick testified that Wingo has never provided for any of Timmy's basic needs such as child support, food, or clothing. Helmick indicated that he planned to work with Wingo on his parenting skills when Wingo visited with Timmy. However, Wingo failed to return for visits, so Helmick was never able to accomplish this goal.

After the first hearing in April 2000, Wingo began attending visitation with Timmy. He attended roughly twelve out of fourteen scheduled visits. However, Helmick stated that he still had concerns regarding visitation because Wingo was sometimes late. Helmick also expressed concern that Wingo had been in a couple of car accidents during that period. On one occasion in July 2000, Wingo informed Helmick that he was hospitalized, but Helmick later learned that Wingo was in jail. Helmick also noted that Wingo was cited for drunkenness in May 2000.

In approximately July 2000, Wingo informed Helmick that he was working as a subcontractor for Cross Creek Satellite and living with his boss. However, Wingo was unable to tell Helmick his boss's name and failed to provide pay stubs or other employment verification when asked to do so. Wingo later provided Helmick with his boss's name.

In August 2000, Helmick conducted a home study of Wingo's residence. Wingo was living with his girlfriend, Erin Baldwin, and her children in Oak Hill. The home conditions appeared fine, but Helmick was concerned with the stability of the situation given Wingo's prior history. Helmick noted that prior to living with Baldwin, Wingo lived in a homeless shelter and had a history of living with various women. Helmick testified that Wingo has two other children by two other women, and he seems to have a problem with maintaining a stable relationship. Wingo also told Helmick that his estranged wife is pregnant.

Wormith testified that she would be willing to adopt Timmy if permanent custody were awarded to RCCS. She testified that she has bonded with Timmy, that he calls her "mommy," and that he is happy in her home. Wormith also testified that Timmy plays with Brandy, but he considers her only a playmate and has not bonded with her. Betty Blazer, Wright's aunt who has custody of Brandy, testified that Brandy and Timmy have bonded. Blazer also testified that Wormith and Timmy love one another.

Based on this testimony, we find that the court's award of permanent custody of Timmy to RCCS is not against the manifest weight of the evidence. Competent and credible evidence supports the court's conclusion that permanent custody is in Timmy's best interest and that he cannot be placed with either Wright or Wingo within a reasonable period of time or should not be placed with either parent. There is also ample evidence to support the court's finding that neither parent has supported Timmy throughout his lifetime and, despite reasonable efforts on the part of RCCS, neither parent is stable enough to care for Timmy. Wingo's first assignment of error is overruled.

### III

In his second assignment of error, Wingo argues that he was denied due process of law and equal protection as guaranteed by the United States and

Ohio Constitutions. Wingo maintains that these constitutional guarantees were violated because RCCS never had any intention of considering appellant or his family as possible placements for Timmy. Moreover, he argues that the evidence indicates that RCCS preferred to keep Timmy, who is "light complected," with his white foster family rather than with Wingo's African American family. We disagree.

As noted in the first assignment of error, the court properly found that Timmy could not be placed with Wingo within a reasonable time period. Therefore, we will not reiterate the evidentiary support for this conclusion. The court also found that RCCS looked to other relatives for placement, but none was appropriate. There is ample support in the record to refute Wingo's allegations that RCCS never considered placing Timmy with his family.

Thomas testified that she conducted a home study of Cheryl Limley Evans, Wingo's mother, in June 1998 and concluded that Timmy should not be placed there. Specifically, RCCS was aware of a substantiated allegation of physical abuse in 1994 involving Evans and Wingo when he was a juvenile. RCCS was also aware of current problems in the home between Evans and her daughter. Additionally, there were allegations, including statements from Wingo, that Evans abused alcohol. Evans was arrested around the time of the home study for endangering children, though the charge was eventually dismissed. Further, Evans told Helmick that she had some medical concerns arising out of a car accident.

Helmick testified that visitations were scheduled between Evans and Timmy at the agency between December 18, 1998 and March 15, 1999. Evans would frequently fail to appear for visitation. There was also an incident in December 1998 where Evans was escorted out of the agency because she became hostile and began using profanity. Evans commented that RCCS was racist and that Timmy did not look like he was Wingo's baby, though paternity had already been established.

Shortly after Timmy's birth, Thomas also approached Sally Limley, Wingo's maternal grandmother, regarding placement of Timmy. Limley stated that she was unable to take custody because of other family commitments. In the summer of 1999, Helmick again asked Limley if she would be willing to take custody of Timmy, but she expressed the same concerns. However, in December 1999, after the permanent custody motion was filed, Limley contacted RCCS and indicated that she was willing to take Timmy as she was no longer caring for one of the children that she'd previously had in her custody.

Helmick testified that he attempted to complete a home study for Limley but was unsuccessful. Limley was unable to provide information regarding her monthly expenses, and Helmick asked her to contact him with the information so

that he could determine the economic feasibility of placement. Limley failed to contact Helmick, and he never received the required information. Helmick was also concerned because he'd obtained a police report regarding a domestic dispute between Limley and her husband, though no criminal charges were filed. Additionally, Helmick was concerned that Limley would be unable to provide long-term care for Timmy due to her advanced age and health problems. Helmick also noted that Limley had not seen Timmy since shortly after his birth, and Timmy was extremely bonded with his foster mother. He expressed concern over Limley's unwillingness to take custody of Timmy until the last minute.

Limley testified that RCCS contacted her about taking custody of Timmy shortly after his birth, but she declined. After the girl that she had custody of was returned to her mother, Limley contacted RCCS and told them she would take custody of Timmy. Limley denied that there was any domestic violence in her home but admitted that she'd called the police a couple times because her husband became so angry that he couldn't breathe.

Limley testified that when Helmick performed the home study, he asked her whether she had seen the baby yet. Limley replied that she hadn't seen him since shortly after his birth. Helmick informed her that he was white and blue-eyed. Limley stated that Timmy couldn't be white if Wingo was the father; he was biracial. Limley construed this conversation as meaning that Helmick felt that Timmy should be placed with a white family. Helmick denied stating that Timmy should be raised in a white home, though he acknowledged stating that Timmy was light-complected.

Limley admitted that she was unable to provide Helmick with the requisite financial information when he came to do the home study because her husband pays the bills. Limley also testified that her husband would not give out that information, and if Helmick never received the financial information, it was because her husband did not provide it to him.

Clearly, there was competent and credible evidence to support the court's finding that Timmy could not be placed with either of these relatives. RCCS determined that Evans's home would not be an appropriate placement and was unable to complete the necessary home study of the Limleys' home because of their lack of cooperation. RCCS had reasonable concerns regarding the placement of Timmy with these family members. Further, even crediting Mrs. Limley's testimony regarding her conversation with Helmick, there is insufficient evidence to support a finding that RCCS refused to place Timmy with any of Wingo's family members because of race. Rather, it appears that Helmick was trying to describe Timmy's appearance to a great-grandmother who hadn't seen her great-grandson in over a year.

In sum, the court's finding that Timmy could not be placed with Wingo, Mrs. Evans, or Mrs. Limley was supported by the evidence. We find no evidence to support Wingo's allegation that his due process and equal protection rights were trampled. Wingo's second assignment of error is overruled.

## IV

In his final assignment of error, Wingo alleges that he was denied his right to effective assistance of counsel. Again, we disagree.

The right to counsel, guaranteed in these proceedings by R.C. 2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel. *In re Heston* (1998), 129 Ohio App.3d 825, 827, 719 N.E.2d 93, 94–95. "Where the proceeding contemplates the loss of parents' 'essential' and 'basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." *Id.* See, also, *In re Brodbeck* (1994), 97 Ohio App.3d 652, 657, 647 N.E.2d 240, 243–244; *Jones v. Lucas Cty. Children Serv. Bd.*, 46 Ohio App.3d at 86, 546 N.E.2d at 472–473.

We apply the test for ineffective assistance of counsel outlined by the Ohio Supreme Court in *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369, 380. The two-part test requires a showing that (1) counsel's performance was defective, and (2) the deficient performance prejudiced the result. *Id.* To prevail, Wingo must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 256–257, 667 N.E.2d at 380–382. Wingo must also prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 257, 667 N.E.2d at 381–382.

Wingo was represented by two different attorneys below and is represented by a third attorney on appeal. He asserts that both of his two prior attorneys were ineffective at various stages of the proceedings.

First, Wingo asserts that his attorney was ineffective at a shelter care hearing on July 2, 1998 wherein the state requested that Timmy be placed in foster care because Wright's relatives were no longer able to care for him. He argues that his attorney erroneously failed to object to hearsay testimony of Thomas regarding statements made by Evans to the on-call social worker and the supervisor.[2] Thomas testified that Evans was upset that she could not have custody of Timmy and that "she was just going to [go] over and just take him."

---

2. Wingo's appellate brief refers to page 99 of the transcript. However, the submission of an amended transcript changed the page numbering to page 106.

While this statement is possibly inadmissible hearsay, the court may have allowed this evidence because it was not being offered for the truth of the matter asserted or as an excited utterance. We need not determine the admissibility of this statement, however, because Wingo has not demonstrated that the outcome of the hearing would have been different but for this evidence. In other words, given the abundance of evidence before the court, this purported ineffectiveness did not prejudice the result. More important, however, the court is not bound by the formal rules of evidence in a shelter care hearing. Juv.R. 7(F)(3).

■ Wingo also asserts that Thomas testified at trial to events and statements outside her personal knowledge without objection from his counsel. We agree that some objections likely would have been sustained had an objection been made during Thomas's testimony; however, much of the information Thomas testified to was also testified to by Helmick and Wormith, who had first-hand knowledge of the events. Moreover, Wingo has not referred this court to specific examples of counsel's failure to object that prejudiced his case.

■ Wingo claims that he was denied effective assistance of counsel because his original attorney failed to submit written argument to the court regarding whether Timmy was a dependent child and failed to appear at the hearing extending temporary custody. Wingo cites *In re Donnelly* (Mar. 31, 2000), Ashtabula App. No. 98–A–0054, unreported, 2000 WL 522484, for the proposition that his constitutional rights were violated by his failure to have representation at the hearing. However, *Donnelly* involved a parent who was unrepresented at a permanent custody hearing; there is no question that Wingo was represented at the permanent custody hearing. Further, Wingo's counsel indicated that Wingo had not been in contact with him, and Wingo himself was not present at the hearing regarding the change in temporary custody, the dispositional hearing, or the hearing regarding the extension of temporary custody. Even assuming that trial counsel's failure to provide written argument and failure to appear at one hearing fell below an objective standard of reasonableness, appellant has not demonstrated how he was prejudiced. At that juncture of the case, RCCS was attempting to reunify Timmy with Wright and place him with a relative until this goal could be accomplished. Wingo had expressed no desire to gain custody of his son, and Wingo's relatives were either not interested in custody of Timmy or considered improper placements by RCCS.

■ Wingo also asserts that his counsel was ineffective at the hearing regarding permanent custody in that she failed to make a single objection on his behalf, did not put Wingo on the stand to testify, failed to file objections to the magistrate's findings, and failed to file an appeal. It is well settled that debatable trial tactics do not give rise to a claim for ineffective assistance of

counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37–38, 402 N.E.2d 1189, 1192. Further, an assertion of a claim must be raised with sufficient clarity to indicate a substantial violation of an essential duty. *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784. Wingo has not specifically referred us to testimony in the record that his trial counsel improperly failed to object to, nor has he demonstrated that counsel was ineffective in failing to have him testify. We have no basis for concluding that his testimony would have been helpful rather than harmful to his case. Further, even assuming that his trial counsel was ineffective for failing to file objections and an appeal, Wingo cannot demonstrate prejudice by these actions. The trial court allowed Wingo to file objections to the magistrate's findings outside the rule and considered the objections. Wingo was likewise not denied an appeal in this case due to his counsel's failure to file the requisite notice.

Lastly, Wingo argues that his counsel was ineffective in failing to attack the constitutionality of the permanent custody statute on the basis that it completely ignores the presumption that the parents are the best placement for the child. Wingo has cited no support for this contention and, given the unlikelihood of success of such an argument, we cannot conclude that he was prejudiced by counsel's failure to raise this argument.

In sum, we note that judicial scrutiny of counsel's performance must be highly deferential. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965, 977. Absent a showing that counsel failed to research the facts or the law, or that counsel was ignorant of a crucial defense when he or she made a tactical choice, a reviewing court will defer to counsel's judgment in the matter. *Clayton, supra,* 62 Ohio St.2d at 49, 16 O.O.3d at 37–38, 402 N.E.2d at 1192. We find no such showing here. Wingo has not demonstrated that counsel failed to produce evidence that would have resulted in the denial of the state's permanent custody motion or failed to object to evidence that, if it had been excluded, would have changed the outcome of this case. Therefore, Wingo's third assignment of error is overruled.

Having found no merit in any of Wingo's assigned errors, we affirm the trial court's judgment.

*Judgment affirmed.*

Peter B. Abele, P.J., and Kline, J., concur.